IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2019

**PHILLIP HARRIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 08-03680        **Chris Craft, Judge**

_____

**No. W2018-01091-CCA-R3-PC**

_____


Phillip Harris, Petitioner, was convicted of one count of attempted second degree murder, five counts of misdemeanor reckless endangerment, and one count of unlawful employment of a firearm during the attempt to commit a dangerous felony, for which he received a total effective sentence of fourteen years and six months to serve in the Tennessee Department of Correction. Petitioner sought post-conviction relief, but the post-conviction court denied relief following a hearing. On appeal, Petitioner contends that he received ineffective assistance of counsel based on trial counsel's failure to discuss trial strategy with Petitioner and inform Petitioner of the proof to be presented by the defense at trial. After a thorough review of the facts and applicable case law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joseph McClusky, Memphis, Tennessee, for the appellant, Phillip Harris.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Melanie Cox, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

On direct appeal, this court summarized the testimony presented at Petitioner's trial as follows:

Redell King, one of the victim[]s in this case, testified that he was nineteen years old and was attending college at Southwest Tennessee Community College where he played wheelchair basketball. He stated that on March 18, 2008, when this incident occurred, he was fifteen years old and was out of school for spring break vacation. That day, King, and his friends K.C. Carter, Rodney Allen, and Barkary Kassama, played basketball at Carter's home, located off of Ross Road in Memphis.

The young men played basketball for a few hours, and once they were finished, King returned a cell phone he had found to its owner on Ross Road. Then King, Allen, Kassama, and Carter walked to Lake Point Park, where they hung out "just being teenagers" and talked to girls. A few minutes later, Paul O'Bannon and Durrell Mickens arrived at the park. King said that he knew Mickens from school but did not know O'Bannon. When it began getting dark, King and his friends left the park and walked to Allen's friend Jermaine Curtis's house, which was located on Nelson Way Drive, off of Ross Road.

King, Allen, Kassama, Carter, O'Bannon, and Mickens walked as a group to Curtis's house. When they arrived, Allen walked up to the door and rang the doorbell while the rest of group stayed at the curb. At the time, Curtis's porch light was on and a motion light on the side of the house also became illuminated when the group walked toward Curtis's house. King stated that this motion light was "very bright" and remained illuminated the entire time they were standing outside Curtis's home. When no one answered the door, Allen walked back to the group at the curb.

King stated that when they were about to leave Curtis's house, a second group of five older men, whom he did not recognize, came up the street and yelled, "[W]ho is that? Who is that?" King said that at the time, he did not know that there was going to be a fight near Curtis's house. These men approached O'Bannon in the street and began arguing with him. He said these older men were of varying heights, and the majority of them

- 2 -

had a light skin tone. He also said that three of them had dreadlocks. O'Bannon began walking backward and one of the older men, later identified as [Petitioner], approached King and his friends at the curb and displayed two guns while the other men in his group approached O'Bannon. King said [Petitioner] got within one or two feet of him. [Petitioner] pointed the guns at King and his friends and informed them that if "any young black American man move[d], he was going to lay [him] out." King said that when [Petitioner] pulled out his two guns, he aimed both guns at his head and his friends' heads. When the group approached [Petitioner], [Petitioner] told them to "handle [their] business[,]" and the men began beating up O'Bannon. O'Bannon eventually broke free of the men and ran up the street to Ross Road. At the time, King thought, "Just let me get away. Just let me . . . just let me live. I didn't know what [Petitioner] was going to do."

King said that he could clearly observe [Petitioner], who had the two guns. He stated that in addition to [Petitioner] being older than him and his friends, [Petitioner] was also approximately six feet tall, with medium skin tone, long d[r]eadlocks, and no facial hair. He did not remember what [Petitioner] was wearing but recalled that both of [Petitioner]'s guns were black. King said that he did not see anyone other than [Petitioner] with a weapon that night.

When O'Bannon began running, [Petitioner] turned away from King and his friends and pointed his guns in O'Bannon's direction before firing four or five gunshots at O'Bannon. King saw the fire coming from the first gunshot as [Petitioner] fired shots at O'Bannon. When King heard the gunshots, he ran in the opposite direction from O'Bannon through an open gate into Curtis's backyard and kept running until he reached the opposite fence, where he tried to jump over the fence. When he climbed up the fence, he realized that he could not jump down the opposite side of the fence because "sticky bushes" and a tree were in the way. He ran to a different part of the fence where there were no bushes or trees. When he climbed to the top of this section of fence, he felt like he "was wobbling" and began falling backward. He said, "[S]omething came to me that I was shot." He acknowledged that he never saw [Petitioner] shooting in his direction because he never looked behind him. He also acknowledged that he did not know whether another member of the other group shot a weapon during the incident. King said that Carter and Allen were ahead of him when they ran into Curtis's backyard. He did not know where Mickens or Kassama were at the time.

King said that after he fell from the fence, he "stayed still" because he did not know if [Petitioner] was still chasing him and his friends. He stated that after [Petitioner] fired the gunshots at O'Bannon, there was a thirty second pause before he heard three to four additional gunshots before he tried to jump over the fence. He could not determine the direction from which this second round of shots was fired. After several minutes, he saw people inside Curtis's house, and he began crawling on his stomach toward the home. At the time, King thought he might be dying. When he saw blue lights in front of Curtis's house, King yelled for help. He said an officer found him in the backyard and asked him what happened. He told the officer what he had seen, and the officer called for additional officers to assist with the scene. King was then transported to the Regional Medical Center at Memphis by helicopter.

King was shot in the upper, middle part of his back, which rendered him permanently paralyzed from the chest down. During surgery, physicians removed blood around the bullet and removed fluid from the left-side of his leg. King underwent physical therapy and remained hospitalized for one or two months.

On March 25, 2008, King talked to officers about the incident. The officers showed him a photographic lineup, and King, while alert and not under the influence of any drugs, identified [Petitioner] as the man with two guns who pointed the gun at him and who shot at O'Bannon. He stated that the officer did not tell him that the shooter would be in the photographic lineup and did not give him any hints or suggestions as to who to choose in the lineup. He also stated that no one else told him whom to choose in the lineup. King testified that he was one hundred percent sure that the photograph he identified in the lineup was the man who had pointed the gun at him and who had pointed the gun and shot at O'Bannon.

King identified [Petitioner] in the courtroom as the man who had displayed and shot the two guns on March, 18, 2008. He stated that he was a hundred percent sure that [Petitioner] was the man who pointed the gun at him and who pointed the gun and shot at O'Bannon. King asserted that he remembered [Petitioner]'s face and specifically remembered [Petitioner]'s chin and facial expression during the incident. He said that [Petitioner] was the only person who had threatened him and the only person he had seen holding a gun during the incident.

Rodney Allen, another victim, testified that on March 18, 2008, he was sixteen and in the tenth grade. That day, he played basketball with King, Carter, and Kassama near Ross Road. After they finished their game, the group walked to the Lake Point Park, where they saw Mickens and O'Bannon, whom Allen knew from school.

Between approximately 7:40 p.m. and 8:00 p.m., Allen, King, Carter, Kassama, Mickens, and O'Bannon left the park and walked down the street to Curtis's house. When they arrived, it was not yet dark, and Allen asked his friends to stay at the curb because Curtis's mother did not know them. Allen knocked on the front door, but no one answered.

As Allen and his friends began to leave Curtis's house, another group of five "much older" men approached them. He said these older men came from two houses down, in the direction opposite the park. These men said, "[W]ho is that?," and Paul O'Bannon said, "[T]his [is] Paul." The men continued to approach Allen and his friends, and [Petitioner] began talking to O'Bannon. At that point, the motion light at the corner of Curtis's home became illuminated, and the motion light and the light from Curtis's porch allowed Allen and his friends to clearly see the older men's faces and allowed them to see that [Petitioner] had two guns. Allen said he recognized Turrell, or T.B., because he had "seen him around." He also recognized [Petitioner] because he had sold him a puppy a year earlier, and had previously had no problems with him. Allen said that T.B. walked toward O'Bannon like he was going to hit him, and [Petitioner], who was still holding the two guns in his hands, said, "If that's [O'Bannon], hit him." Allen said [Petitioner] wore a black shirt and had dreadlocks, which he wore down. He noticed that some of the other men in [Petitioner]'s group had dreadlocks, but the only two men that he knew in the group were T.B. and [Petitioner].

When T.B. approached O'Bannon, O'Bannon began walking backward and stated, "This ain't what you think." As Allen and the rest of his friends tried to leave, [Petitioner] pointed a gun at Allen's head and waved a gun at Allen's friends and said, "[If] one of y'all move again I'm going to shoot one of y'all." Allen explained that [Petitioner] raised only one gun during the incident, although he was holding another gun "like he was ready to use that [one] too[.]" Allen and his friends did not move after [Petitioner]'s threat.

- 5 -

Then, [Petitioner], who still had his guns raised, walked behind T.B. like he was going to help T.B. hurt O'Bannon. O'Bannon "took off running," and [Petitioner] began shooting at O'Bannon. Allen saw [Petitioner] fire his first shot at O'Bannon and said that [Petitioner] fired a total of two or three shots at O'Bannon. Allen identified [Petitioner] in the courtroom as the man who shot the guns the night of the incident. He stated that he did not see anyone else with a weapon that night.

When Allen and his friends heard the first shot, they ran through Curtis's gate to the backyard, where they jumped the fence and ended up at Holmes Road. All of his friends, except for King, arrived at Holmes Road. Allen said [Petitioner] probably shot toward them when they ran, but he was unsure because he was running away from [Petitioner]. After the shots were fired in O'Bannon's direction, Allen heard additional shots as he was jumping over the fence but could not determine whether they were coming toward him or not. He did not know how many additional shots he heard because he was running, although the gunshots were "[c]onstant[.]" Allen learned that King had been shot when he called Curtis that night. He returned to Curtis's home later that night to speak to the police about the incident. Allen said he told the police that the shooter's nickname was "Phil" because he did not know his full name at the time.

Allen acknowledged that he did not know whether someone other than [Petitioner] pulled out a gun and began shooting. He did not recall telling the police that he was unable to describe the person shooting the guns because the street was really dark and that he did not know any of the other men in the group.

Paul O'Bannon, who was a few years older than the other victims, testified that approximately a week prior to March 18, 2008, he witnessed an incident involving his neighbor Edgar (last name not provided), and Tony Brown, also known by the nickname of T.B., at a car wash. O'Bannon explained that he and Edgar were "like brothers" and that he knew T.B. through mutual friends, although Edgar and T.B. disliked one another. During this incident, which occurred prior to March 18, 2008, O'Bannon rode with Edgar to the car wash at the intersection of Riverdale Road and Holmes Road and saw T.B. washing his car. When O'Bannon greeted T.B., Edgar began "acting funny . . . like he was up to something." Shortly thereafter, some of Edgar's friends arrived at the car wash, got out of their truck, and beat up T.B. O'Bannon stayed in his car during the fight because he did not want to be involved. After Edgar's friends beat up T.B.,

they left, and Edgar drove his car around to look at T.B. As they got close, O'Bannon and T.B. "locked eyes," which made O'Bannon think that T.B. believed he set him up because O'Bannon had just talked to T.B. before the fight. O'Bannon insisted at trial that he had nothing to do with T.B.'s beating. He said he tried to contact T.B. about the incident at the car wash but was unable to get in touch with him.

On March 18, 2008, O'Bannon planned on working the late shift that night at Fed Ex starting at 9:30 p.m. O'Bannon, Edgar, and Mickens went to the park that afternoon, where they saw Allen, Carter, and someone whose name he could not remember. They hung out at the park for a while, and Edgar left the park to go home. When Edgar left, O'Bannon walked with Carter, Allen, Mickens, and the guy whose name he could not recall, to "the other neighborhood" on Nelson Way Drive off of Ross Road. He said he did not go to this neighborhood to fight T.B.

When the group walked halfway down Nelson Way Drive, they heard ask, "[W]ho is that?," and he replied, "Paul . . . who is that?[,]" and the other man replied, "T.B." O'Bannon was not concerned, and he and his friends continued to walk down the road. T.B. approached O'Bannon as if he wanted to fight. Suddenly, five or six men came from the house where they had been standing, and O'Bannon began wondering what was going on. At that moment, O'Bannon realized that T.B. thought that he had set him up at the car wash. O'Bannon recognized Chris and Chris's brother Pee-wee, who were also in T.B.'s group. He also recognized [Petitioner] who he had seen "[a]round the area," although he had never had any trouble with him. O'Bannon said that [Petitioner] was "a little bit taller" than him, had lighter skin than him, and wore his dreadlocks down that night. He said [Petitioner] stood out because he was "the tallest one out there." He said he did not know where his friends were standing at the time because he was concentrating on T.B.

O'Bannon said that when the rest of T.B.'s group approached him, he took a step back. He and the men in T.B.'s group exchanged a few words, and [Petitioner] asked T.B. if O'Bannon was one of the guys who jumped him, and O'Bannon said, "[N]aw." [Petitioner] displayed one gun, which he pointed at O'Bannon's face and neck. He was unsure whether [Petitioner] had a second gun in his other hand. When O'Bannon saw the gunfire from [Petitioner]'s first shot, he closed his eyes because he thought he had been shot. When he heard the second shot, he took off running. O'Bannon said [Petitioner] was standing ten to fifteen feet away from him

- 7 -

when he fired the first shot at him and was able to see [Petitioner] face as he shot the gun, even though it was "getting dark" outside. He identified [Petitioner] in the courtroom as the person who shot at him the night of the incident and was one hundred percent certain of his identification. When he heard the first gunshot, O'Bannon believed that he had been hit. When he realized that he had not been shot, he ran and "heard several more shots" as he ran toward Ross Road.

Once he escaped, O'Bannon went home. He later got in his car and drove around the area, but the police had the area closed, and he returned home. The next day, when he spoke to officers at the police station about the incident, O'Bannon said he did not tell them everything that happened because he did not like the manner in which the officers "pulled [him] out of [his] house like [he had] committed a crime." O'Bannon said that [Petitioner] was the only person he saw holding a gun on the night of March 18, 2008.

O'Bannon admitted previously testifying that he and his friends went to the neighborhood on Nelson Way Drive to see a fight that was unrelated to T.B.'s beating at the car wash. He said he did not know if the fight he was going to see ever occurred because the incident with T.B. and [Petitioner] prevented them from going to the area.

K.C. Carter, still another victim, testified that on March 18, 2008, he was fifteen years old and in the ninth grade. That day, he played basketball with Allen, Kassama, King, and Mickens in their neighborhood near Ross Road before walking with them to the park near Ross Road. They saw O'Bannon at the park and stayed there talking until it started to get dark outside. Around 7:30 p.m., Carter, Allen, Kassama, King, Mickens and O'Bannon left the park and walked to Curtis's house.

When they got to Curtis's house, Allen knocked on the front door while the rest of the group stayed behind in the driveway. When no one answered the door, Carter and his friends began to leave the home when five to seven men that he did not know approached and began asking them questions. Carter said these men looked older than him and his friends and appeared to be in their twenties.

While most of the men in the other group approached O'Bannon, [Petitioner][] approached Carter and his friends, waived his two guns in their faces, and told them that he would shoot them if they moved. Carter

said [Petitioner]'s two guns were black in color and looked like "40 cals." He said [Petitioner] was six feet, three or four inches tall, had dreadlocks that he wore down, and had one gold tooth.

After [Petitioner] threatened to shoot Carter and his friends, [Petitioner] told T.B. to "get" O'Bannon. When [Petitioner] and T.B. began walking toward O'Bannon, Carter saw [Petitioner] fire two or three shots in O'Bannon's direction. When O'Bannon fell and got up and began running, Carter and his other friends ran into Curtis's backyard and tried to find the best place to climb over the fence because there were woods on the other side. When they got to the top of the fence, they heard three or four gunshots in their direction, two of which hit the fence, so they knew the shooter was close. Carter acknowledged that he did not see who was shooting at the fence. He and his friends jumped over the fence, fell into the woods on the other side, and ran to a four-way stop at the nearest street. At that point, they realized that King was not with them.

Carter later discovered that King [had] been shot in Curtis's backyard. He talked to the police about the incident and identified [Petitioner] from a photographic lineup. Carter stated that the officer that showed him the photographic lineup did not tell him that the shooter was in the lineup and did not give him any hints about which photograph to select. He chose [Petitioner]'s picture because [Petitioner] was the "person that [he had] seen outside that was pointing the guns towards our way. That was aiming all in my face." He said that although he had never seen Harris before the incident, he would never forget [Petitioner]'s face because the incident was "like a nightmare[.]" Carter said that he was one hundred percent sure of his identification of [Petitioner] as the man who pointed the guns at him and his friends the night of the incident. Carter also identified [Petitioner] in the courtroom as the person who had the two guns during the incident. He confirmed that [Petitioner] was the only person that he saw with a weapon the night of the incident.

Carter said [Petitioner] was the only person in the other group with dreadlocks. However, he admitted that he could not see the other people in [Petitioner]'s group because [Petitioner] was the only man that got close to him and his friends. Carter said he told the police that [Petitioner] had dreadlocks and one gold tooth but did not recall telling Sergeant Cunninghan that the person who pulled the guns on them was tall and skinny with dark skin. He admitted that he had no idea who fired the gunshots at him and his friends in the backyard and did not know the origin

- 9 -

of those gunshots. He also admitted that someone other than [Petitioner] could have pulled out a weapon and begun firing shots.

Bernard Cleveland, who lived on Nelson Way Drive, testified that on March 18, 2008, at 6:30 or 7:00 p.m., he heard two or three gunshots outside his home. He looked out his window and saw five to seven men quickly get into their vehicles and leave the house across the street. He was able to see these men well because it was still light outside. Cleveland did not see any of these men carrying a weapon and did not see any shots being fired.

Cleveland saw the men get in three different vehicles, a green Ford Expedition, a red Pontiac Sunfire, and an Oldsmobile, before driving away from the scene. He said at least two of the men, around twenty years of age, got into the Expedition and at least two men got into the Sunfire and the Oldsmobile. The Expedition and the Oldsmobile traveled west and the Sunfire traveled east on Nelson Way Drive. Cleveland said it took approximately thirty minutes to drive from his house to downtown.

When Cleveland heard the shots, he told his fiancé to call 9-1-1. After the three vehicles left the scene, Cleveland went outside and saw his neighbor across the street. As he talked his neighbor about what had just happened, he saw a Pontiac Sunfire, that appeared to be the same car that had just left the area, return to the neighborhood. He said a woman was driving the Sunfire, and a man was riding in the passenger seat. The man, a young African-American male with a slim build and dreadlocks, took off his shirt and threw it underneath the car next to the Sunfire before getting back inside the Sunfire and leaving the neighborhood. Approximately two minutes later, a sheriff's deputy arrived at the scene. Cleveland said that the deputy arrived from the same direction that the Sunfire had just left the neighborhood.

Rhonda Davis, the Shelby County Sheriff's Department Communication Specialist, testified that she was the keeper of the records for all 9-1-1 calls. On March 18, 2008, she stated that the Sheriff's Department received six 9-1-1 calls from the area near Nelson Way Drive. She said the first call was received at 8:01 p.m. from Larry Brown at 6681 Nelson Way Drive. Brown told the dispatcher that "there were subjects shooting in the area" and that one of the subjects was armed with a pistol. A second call was received at 8:02 p.m. from 6685 Nelson Way Drive, and this caller stated that she had heard eight to nine shots behind her house. A

- 10 -

third call was also received at 8:02 p.m. from a caller who was "next door to 6696 Nelson Way Drive" and who stated that shots had been fired. The fourth call was received at 8:03 p.m., via a cellular phone, from Martha Hunt at 6662 West Spencer Forest Cove, who said that she had heard approximately ten gunshots from a field behind her house. A fifth call was received at 8:05 p.m. from 6609 Silver Oak Cove. The caller stated that he was walking his dog when he saw four or five juveniles running across his neighbor's yard and around a corner. The sixth call was received at 8:06 p.m., and the caller stated that she had seen subjects get into a green Ford Expedition and a red vehicle and leave the crime scene.

James Stroud, a patrolman with the Shelby County Sheriff's office, testified that on March 18, 2008, he received a call that shots had been fired on Nelson Way Drive. His report indicated that the shots had been fired between 7:40 p.m. and 8:00 p.m. The call stated that cars, including a green Ford Expedition or Explorer and a red vehicle, had been at the crime scene. Officer Stroud got to the scene within a few minutes of the call but did not see vehicles matching those descriptions. When he investigated the scene, he found over twenty .40 caliber shell casings in the street east of 6665 Nelson Way Drive near Ross Road. He then talked with several witnesses in the neighborhood, who told him that some African-American men had been shooting west down Nelson Way Drive.

As Officer Stroud looked for rounds that might have gone in nearby houses, he heard someone moaning. He walked into the fenced-in backyard of a home in the 6000 block of Nelson Way Drive and found an African-American male juvenile, later identified as Redell King, lying on his stomach. King appeared to have a gunshot wound in his back but was able to talk. Officer Stroud called an ambulance for King before securing the crime scene and calling for detectives. Officer Stroud stated that he did not find any shell casings in the backyard and that all the shell casings were in the front yard.

James Sneed, a sergeant with the homicide unit of Shelby County Sheriff's Department, testified that he responded to the shooting at 6665 Nelson Way Drive on March 18, 2008. He observed and collected nine .40 caliber shell casings, from different manufacturers, near 6665 Nelson Way Drive. He found four of these casings in the front yard of 6665 Nelson Way Drive and five of these casings in the street near the drainage area. He also observed several holes, that looked to be bullet holes, in the six foot fence at the property located at 6665 Nelson Way Drive. Sergeant Sneed

- 11 -

also found a bullet hole in the glass next to the front door of a home at 6690 Nelson Way Drive, which was east of the home located at 6665 Nelson Way Drive. When he inspected the home, he found that the bullet had entered the home through the front door and traveled through the den and out the rear window of the home. He found a bullet fragment near the bullet hole near the home's rear window.

Lewis Chapman, a deputy with the Shelby County Sheriff's Department, testified that on March 24, 2008[,] [he] was asked by a supervisor to conduct surveillance and to locate [Petitioner]. He was told that a green Ford Expedition was seen leaving the scene, and he obtained [Petitioner]'s driver[']s license photograph so that he could identify him. He parked his unmarked, white Ford truck in an area of southeastern Shelby County where his supervisor had told him to go and waited for a green Ford Expedition to enter the area. As he was waiting, he saw a green Ford Expedition pass his car from the rear and park in front of a home a short distance away. He then saw an African-American male, who was approximately six feet tall with dreadlocks and who was wearing a t-shirt and shorts and carrying a gym bag, exit the green Expedition and walk through the front door of the house. Deputy Chapman concluded that the man who entered the home appeared to be [Petitioner]. He quickly informed his supervisor that he had possibly located [Petitioner]. He then told Lieutenant Hubbard that he had located a subject driving a green Ford Expedition that matched [Petitioner]'s description. Shortly thereafter, several officers arrived at Deputy Chapman's location and entered the home. Deputy Chapman identified [Petitioner] in the courtroom as the man he had seen driving the green Ford Expedition on March 24, 2008.

Chris Harris, a sergeant with the Shelby County Sheriff's Department, testified that on March 24, 2008, he received a call from Lieutenant Hubbard that [Petitioner] had been located at a home at 6310 Harvest Run. Sergeant Harris told his team of officers to go to that location. When Sergeant Harris arrived at the scene, he saw an older model green Ford Expedition parked in front the home. Several of the officers approached the home and knocked on the door. A woman, later identified as [Petitioner]'s mother, answered the door, and the officers asked for [Petitioner]. When [Petitioner] appeared, Sergeant Harris concluded that he matched the description and photograph they had. He told [Petitioner] that detectives wanted to talk with him, and the officers handcuffed him before transporting him downtown. Sergeant Harris identified [Petitioner] in the

courtroom as the man he saw at the 6310 Harvest Run address on March 24, 2008.

Sergeant Harris obtained consent from [Petitioner]'s mother, Paula Mickens, to search the home and the green Ford Expedition, which belonged to her. Inside [Petitioner]'s bedroom, he found a gun box, a holster, a shooting target, and ammunition in a box next to the bed but did not find a weapon. The ammunition box contained Federal .40 caliber ammunition, but four of the bullets were missing. The gun box contained the label "Mauser M2 pistol 40 caliber Smith and Wesson." He stated that even though the missing gun was a Smith and Wesson, it was capable of firing bullets of the appropriate caliber from other manufacturers, such as Winchester and Federal. Sergeant Harris did not discover any weapons or ammunition during his search of the Expedition. He stated that [Petitioner] and Mickens cooperated with the officers on March 24, 2008.

Richard Goforth, a detective with the Shelby County Sheriff's Department, testified that on March 28, 2008, he was instructed by Sergeant Pam Hazel to photograph a vehicle located at 6310 Harvest Run Cove, Memphis, Tennessee. After obtaining written consent from Paula Mickens to search the 1997 Ford Expedition, Detective Goforth searched and photographed the vehicle. During his search he found a Tennessee license tag on the car's floorboard, a direct deposit statement from the Hershey Company payable to Phillip A. Harris at 6310 Harvest Run Cove inside the passenger side door pocket, and men's shoes under the car seat.

Reginald Hubbard, a lieutenant with the narcotics division of the Shelby County Sheriff's Department, testified that he was the lead detective in the shooting case at 6665 Nelson Way Drive. By the time Lieutenant Hubbard got to the crime scene on March 18, 2008, it was nighttime and the crime scene was in "chaos," with ambulances, patrol cars, and neighbors standing outside. He talked with six to ten witnesses that night and instructed other officers to collect evidence in the case. Lieutenant Hubbard stated that Bernard Cleveland, a next-door neighbor, told him that he had seen a green Ford Expedition, a red Pontiac Sunfire, and a white vehicle leave the area that night. Cleveland also told officers that an African-American in a red Sunfire returned to the scene and threw his shirt under another vehicle. Lieutenant Hubbard stated that the suspect who returned in the Sunfire was located, but because he did not match the descriptions given by witnesses at the scene, other than the fact that he had dreadlocks, he was released after he refused to cooperate. He said this

- 13 -

suspect's picture was never placed into a photographic lineup and was never shown to witnesses in this case. Another witness told him that the suspect in the shooting was tall, approximately six feet, one inch tall, and weighed between 175 to 195 pounds. Lieutenant Hubbard asked patrol officers familiar with the area to look for the three vehicles Cleveland had described. He said that one of the patrol officers knew that [Petitioner] drove a green Ford Expedition and located [Petitioner] and the vehicle a few days later.

After learning that [Petitioner] drove a green Ford Expedition, Lieutenant Hubbard included [Petitioner]'s picture in a photographic lineup. On March 25, 2008, Redell King positively identified [Petitioner] from the lineup. That same day, K.C. Carter also positively identified [Petitioner] in the photographic lineup. Carter said [Petitioner] was tall, was "bright-skinned[,]" and wore his hair in long dreadlocks. Lieutenant Hubbard stated that it took King and Carter less that one minute to identify [Petitioner] as the perpetrator in the photograph lineup.

Shelly Betts, a special agent with the firearm identification unit of the Tennessee Bureau of Investigation, was declared an expert in the area of firearms identification and ballistics. She examined the nine fired .40 caliber shell casings and the one fired projectile that were collected as evidence in this case. Of these nine shell casings, two were Remington .40 caliber fired shell cases, two were Federal .40 caliber fired cartridge cases, two were Winchester .40 caliber fired cartridge cases, and three were Speer .40 caliber fired cartridge cases. She concluded that all nine of the shell casings had been fired from the same weapon because they all had the same mechanical fingerprints. She also examined the fired projectile, but because the copper jacket was not recovered from the crime scene and the lead bullet never contacted the gun, she was unable to identify the caliber of gun that fired that projectile and was unable to connect that projectile to a particular handgun.

Agent Betts stated that most .40 caliber handguns are semi-automatic pistols that can hold ten to fifteen rounds. She said Mauser is a German manufacturer that makes rifles and handguns, including a .40 caliber handgun that can fire the type of bullet matching the shell casings collected as evidence in this case. However, she said that she could not determine whether the bullet casings had been fired from a Mauser firearm without examining the specific Mauser handgun. After examining the gun box that was found in [Petitioner]'s bedroom, she concluded that the gun

originally sold in the box was a Mauser .40 caliber Smith and Wesson M2 semi-automatic pistol. She also concluded that the box of ammunition found in [Petitioner]'s bedroom contained nine Federal .40 caliber hollow point shells, that were originally sold in the ammunition box, and seven reloaded .40 caliber shells from a different manufacturer that were placed in the box after it was sold. She stated that all sixteen shells in the ammunition box could have been fired from a Mauser .40 caliber Smith and Wesson M2 semi-automatic pistol.

### Defense's Proof

Wanda McKinnon, the Senior Human Resource Business Partner for the Hershey Company in Memphis, Tennessee, testified that [Petitioner] was hired by the Hershey Company in March 2007 as an assembly worker. She explained that employees of the Hershey Company have to scan their badges to access the building and the building's parking lot. McKinnon said the company keeps journal reports documenting each employee's unique number and the times the employee scans his or her badge to access the building or the parking lot.

The Hershey Company's report shows that on March 18, 2008, [Petitioner] scanned his badge at the company parking lot at 8:43 p.m. and scanned his badge at the building at 8:47 p.m. The company's records also showed that [Petitioner] clocked into work at 8:50 p.m. on March 18, 2008, and then signed the training log for the training session. She said that it was not possible for someone else to have shown up to work on [Petitioner]'s behalf because there were two security guards at the checkpoints at the parking lot and the building and because a supervisor who was familiar with [Petitioner] was at the training session. McKinnon explained that although [Petitioner] was scheduled to work from 10:00 p.m. to 6:00 a.m., the company had a mandatory training session at 9:00 p.m. the night of March 18, 2008.

Faith Cunningham, a lieutenant with the Shelby County Sheriff's Department, testified that she responded to the scene on March 18, 2008, and interviewed K.C. Carter and Rodney Allen. She acknowledged that Carter and Allen, who were fifteen and sixteen years old respectively, had been waiting in squad cars until she talked to them. She stated that although Allen and Carter both appeared scared and nervous, they cooperated with her. Carter told her that the person holding the gun was "dark skinned." When Lieutenant Cunningham asked him what the man

holding the gun was wearing, Carter, replied, "I couldn't really see in the dark." When she asked him if he could see any of the men that shot at him, Carter, said, "[N]o ma'am. After we started running we [were not] looking back or nothing." Allen told Lieutenant Cunningham that there had been six people in the other group that night and that he said he did not recognize any of them. She said Allen never mentioned that he had bought a dog from one of the men in the group prior to the incident. When she asked him to describe the suspect, Allen said, "It was dark. This whole street is like pitch black." When she asked him if he could remember anything about the person with the guns, Allen replied, "[D]reads." Allen also said that the person with the guns was approximately six feet, three or four inches tall and weighed approximately 230 pounds. Lieutenant Cunningham acknowledged that Allen and Carter did not get a chance to review the transcripts of their recorded statements. She also admitted it was possible that the secretary who transcribed Allen's and Carter's statements could have misheard something during her transcription. She also acknowledged that witnesses are sometimes reluctant to identify an individual at the beginning of the case because they are scared. However, she admitted that Allen and Carter appeared truthful when talking to her about what happened.

Paula Mickens, [Petitioner]'s mother, testified that in March 2008, [Petitioner] was twenty-five years old, lived at her house, and worked at the Hershey Company's factory downtown. She said that [Petitioner] had his own bedroom and his own set of keys to her home. On March 18, 2008, Ms. Mickens awakened [Petitioner] at 7:45 p.m. so that he could attend a safety meeting at work. She said that after she woke him, she saw [Petitioner] get ready for work, get his lunch, and leave her home by 8:15 p.m. She said [Petitioner] returned home the next morning on March 19, 2008, although she could not recall the exact time. She stated that the police came to her home on March 24, 2008, and placed [Petitioner] in handcuffs.

Ms. Mickens asserted that [Petitioner] did not drive her Ford Expedition on March 18, 2008, because he was asleep. That day, she drove the Expedition until around 5:30 p.m. because she was delivering packages for her job. When she returned home, she kept the keys for the Expedition with her. She later testified that on March 18, 2008, her last delivery was at 2:00 p.m., and she stayed home for the rest of the afternoon. She stated that although she allowed [Petitioner] to drive the Expedition, the car belonged to her, and [Petitioner] drove a PT Cruiser, which was [Petitioner]'s

primary car. Although she had two sets of keys to the Expedition, [Petitioner] never had the extra set of keys to the Expedition unless she deliberately gave them to him. She explained that [Petitioner] had to ask her permission to get the keys to the Expedition regardless of where he was going. Ms. Mickens stated that [Petitioner] usually drove his PT Cruiser to work and only drove the Expedition if his car was not operating. She testified that [Petitioner] had driven her Expedition to work only four or five times within the last year. She was not surprised that [Petitioner] left his shoes or his direct deposit slip in the Expedition.

Ms. Mickens stated that she did not own a gun. She knew that [Petitioner] owned a gun, although she did not know what kind, and knew that he kept it in his gun case in his bedroom. She also knew that [Petitioner] kept a holster, a target, and ammunition in a shoe box next to his bed. She said [Petitioner] had purchased the gun prior to his arrest on March 24, 2008, and she had never seen him leave the house with it. She said she had never seen [Petitioner] with two guns and had never noticed two guns inside her house. She asserted that [Petitioner] had applied for a gun permit prior to the offense in this case.

Ms. Mickens said that she was "devastated" when [Petitioner] was arrested on March 24, 2008. She cooperated with officers and allowed them to search her house and her Ford Expedition and allowed them to take photographs of her Expedition on March 24, 2008, and March 26, 2008.

Ms. Micken acknowledged that she had never told the police that she awakened [Petitioner] at 7:45 p.m. on March 18, 2008, for his safety meeting at work. She also acknowledged that although officers came to her home on March 24, 2008 and March 26, 2008, she never told them that [Petitioner] had been asleep on March 18, 2008, during the incident. She admitted that she never testified at her son's preliminary hearing and that the first time she had presented this alibi was at trial.

[Petitioner] testified that in March 2008 he was twenty-five years old and worked on the assembly line at the Hershey Company during the graveyard shift from 10:00 p.m. to 6:00 a.m. He said he was six feet, one inch tall and in 2008 wore his hair in dreadlocks, which he wore down. [Petitioner] said he owned a 2003 PT Cruiser, and his mother owned a Ford Expedition. Although his mother had a spare set of keys to the Expedition, he had to ask her for the keys before he could drive her car. He admitted that he had driven the Expedition to work on February 29, 2008, and to the

- 17 -

gym on March 24, 2008. He said that because his mother did not work at night, he sometimes drove her Expedition to work.

[Petitioner] asserted that he drove his PT Cruiser on March 18, 2008, and did not go to Nelson Way Drive. He denied knowing T.B. and denied being with a group of people that night that included T.B. He said he did not spend time with his friends before going to work on March 18, 2008, because he was asleep. He claimed he did not have friends in his neighborhood because he was always at work.

[Petitioner] said he did not know Redell King, Paul O'Bannon, Rodney Allen, K.C. Carter, Barkary Kassama, or Durrell Mickens and had never had any arguments with these men. He denied shooting at any of the victims and claimed he was "not that type of guy." He said the shell casings found at the crime scene did not belong to him. He also asserted that he had never sold or bought a dog from Rodney Allen.

[Petitioner] admitted that King, O'Bannon, Allen, and Carter had identified him as the suspect in this case at his preliminary hearing and at trial. He also admitted that King and Carter had identified him in a photographic lineup as the person who threatened them and pointed the gun at them on Nelson Way Drive on March 18, 2008.

[Petitioner] said that his home was five to seven minutes away from Nelson Way Drive. He said he knew one person, Walter Watkins, who lived with his mother and younger brother, Christopher Watkins, a couple of houses down from 6665 Nelson Way Drive. [Petitioner] asserted that he did not spend any time with Walter Watkins on March 18, 2008.

At the time of the incident on March 18, 2008, between 7:45 and 8:00 p.m., [Petitioner] said he was waking up and getting ready to leave for work. He said his mother awakened him on March 18, 2008, around 7:45 p.m., as was her custom. He went to work, attended the safety meeting, completed his shift, clocked out, and played basketball and worked out at the YMCA gym in Whitehaven before returning home and going to sleep. He admitted that the first time he presented this alibi defense was at trial.

[Petitioner] acknowledged that the offenses in this case occurred around 8:01 p.m. on March 18, 2008. He said his home was a thirty to thirty-five minute drive from his work and that it would also take him thirty to thirty-five minutes to drive from Nelson Way Drive to his work. He

- 18 -

acknowledged that the Hershey Company's records showed that he arrived at work at 8:43 p.m.

[Petitioner] said that he could remember what he did on March 18, 2008, because it was one of the worst days of his life and a day he would never forget. He explained, "I was accused of a crime that I did not do, [did not] have anything to do with it. I never seen these . . . guys a day in my life and they got my life on the line right now." He later acknowledged that March 24, 2008, was actually the worst night of his life because that was the night he was arrested. He said that he did not know that a shooting had occurred on March 18, 2008, until the officers informed him of it the day of his arrest.

[Petitioner] admitted that the police found a shooting target, gun box, holster, and shells in his room. He acknowledged that in 2007, he bought a .40 caliber semi-automatic handgun for safety purposes but asserted that he never owned two guns. He said he went to the shooting range every week and had applied for a gun carry permit on February 26, 2008. He said his handgun shot .40 caliber bullets.

[Petitioner] said he never discarded his weapon and that he "honest to God" did not know what happened to his gun. He said he realized that . . . his gun was missing when the police opened his gun box and told him that it was empty. He claimed his missing gun was "something totally new to [him] when the officers came to [his] house on that day and picked [him] up[,]" and assumed someone had stolen his gun. Although he said he had many friends who came over to his house to play video games and basketball, he did not know who could have taken his gun. The last time he saw his gun was around two weeks before his arrest.

[Petitioner] said he cooperated with officers on March 24, 2008. After his arrest, he told officers that he had not done anything wrong and had been at work the night of the shooting. He was later released and continued to work. In May 2010, [Petitioner] was fired from the Hershey Company because of the criminal charges associated with this case.

[Petitioner] asserted that he did not commit the crimes in this case and was "nowhere on the scene." Instead, he had a job and was "doing the right things in life." He claimed he would "never do something like this and head to work. That wouldn't make no sense."

- 19 -

*State v. Phillip Harris*, No. W2013-01028-CCA-R3-CD, 2014 WL 3954054, at *1-14 (Tenn. Crim. App. Aug. 13, 2014) (footnotes omitted), *perm. app. denied* (Tenn. Dec. 18, 2014). Following deliberations, the jury convicted Petitioner of one count of attempted second degree murder, five counts of misdemeanor reckless endangerment, and one count of unlawful employment of a firearm during the attempt to commit a dangerous felony. *Id.* at *1. The trial court sentenced Petitioner to twelve years for attempted second degree murder and to a mandatory consecutive sentence of six years for unlawful employment of a firearm during the attempt to commit a dangerous felony. *Id.* The court also imposed sentences of eleven months and twenty-nine days for each of the reckless endangerment convictions and ordered these sentences to be served concurrently with the sentence for attempted second degree murder. *Id.* This court affirmed Petitioner's convictions but remanded for resentencing as to the conviction for second degree murder, and the Tennessee Supreme Court denied further review. *Id.* On remand, Petitioner was sentenced to serve an effective sentence of fourteen years and six months.

On December 14, 2015, Petitioner filed a timely *pro se* petition for post-conviction relief and then retained post-conviction counsel. Petitioner alleged that trial counsel rendered ineffective assistance of counsel based on trial counsel's failure to meet with Petitioner and keep him informed of the evidence against him and trial counsel's failure to meaningfully investigate, present, or challenge witnesses. At a hearing on the petition, trial counsel testified that he had twelve to thirteen years' experience representing criminal defendants by the time that he represented Petitioner. Trial counsel explained that he took over the case after Petitioner's prior counsel discovered that he had a conflict during the first trial of the case. Trial counsel could not recall how many times he met with Petitioner before trial, but he explained that his general practice was to meet with clients on court dates and to review discovery. Additionally, trial counsel stated that he would meet with clients "as things came up" and that he would have meetings more frequently with clients as a trial date approached.

Trial counsel recalled that, when he took over the case, Petitioner's prior counsel gave him a trial notebook, which was a "very organized" file "breaking down witnesses[] [and] their statements." Trial counsel stated that Petitioner's defense at trial was "that he was innocent." Petitioner claimed that he had been at work at the time of the shooting, and trial counsel presented witnesses and work records at trial that supported Petitioner's claim. Trial counsel recalled that Petitioner's alibi was imperfect; the defense "established that [Petitioner] clocked in to work as he normally would have, close in time . . . . But . . . on cross[-examination] it was determined that he probably still would have had enough time." Trial counsel did not recall any issues regarding how the police conducted the witnesses' out-of-court identifications. He stated that, if he had seen evidence of improper police tactics, he would have filed a motion to suppress the witness identifications. According to trial counsel, the State made an offer to settle the case in

- 20 -

which Petitioner was to receive a fifty-four year sentence. Trial counsel explained that Petitioner rejected this offer and that Petitioner "was never interested in an offer" because "he was innocent." Trial counsel did not recall any issue relating to an officer's collecting evidence at the crime scene without wearing gloves and then storing shell casings from the scene in his office for a few days before they were tagged and put into the evidence locker. Trial counsel said that, if he had been aware of such an incident, he would have challenged the chain of custody at trial. He stated that he did not file a motion to dismiss two of Petitioner's charges based on the victims not being called to testify because there were other additional witnesses at the scene, and there was sufficient testimony to support the charges.

On cross-examination, the trial court said that there had been inconsistencies in the witnesses' identification of Petitioner, which he brought out through his cross-examination of the witnesses. Trial counsel stated that he "definitely challenged the proof," explaining that Petitioner was convicted of lesser-included offenses in four counts. He noted that Petitioner was "intelligent, smart, presented well, [and his] family presented well" and had a good work history.

Petitioner testified that trial counsel represented him for about two years while Petitioner was out on bond. Petitioner stated that trial counsel never met with him to discuss the case and that the only time Petitioner was at trial counsel's office was to "make a payment." Petitioner said that trial counsel never discussed with him trial strategy, the State's evidence, or witnesses that the defense might call at trial. Petitioner testified that trial counsel was unprepared for trial and asserted that trial counsel should have filed some pretrial motions and objected more during trial. Specifically, Petitioner stated that trial counsel should have moved to suppress one of the victim's identification of Petitioner based on improper police procedure and objected to certain photographs introduced at trial and to portions of the prosecutor's closing argument.

On cross-examination, Petitioner agreed that prior counsel met with him in preparation for trial. Petitioner stated, "I met with [prior counsel] and he told me how everything was looking and this is the way we [were] going to go and stuff like that." He recalled that prior counsel eventually referred him to trial counsel. Petitioner further recalled that trial counsel raised an alibi defense at trial and put on witnesses to establish the defense, including a representative from Hershey's and Petitioner's mother.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and later issued a written order denying relief. Regarding Petitioner's claim that trial counsel rendered ineffective assistance by failing to discuss with Petitioner trial strategy and the proof to be presented by the defense, the post-conviction court found as follows:

[Petitioner] was arrested on March 24, 2008, made a $250,000 bond and was indicted June 5, 2008, for six counts of attempted second degree murder and employing a firearm during a dangerous felony. He hired [prior counsel] to represent him at trial, and this court presided over his first jury trial, which began on March 21, 2011. The defense was one of alibi. The jury was sworn, and on the third day of trial it was discovered that one of the victims in the trial, who was an essential witness for the State, after the offense on trial, had been charged with Murder First Degree in an unrelated case and had consulted with the law partner and son of [prior counsel] . . . about arraigning him once his case was indicted. [Prior counsel's] firm had already requested and received a copy of the murder file from the Office of the Public Defender which had represented the witness in General Sessions court for its use after indictment and arraignment. Although the file was brought to court and was found not to have been opened (and was still sealed in its original mailing), this court found there was a conflict in representation, and [Petitioner] did not wish to waive that conflict and instead stated that he wished to have the trial stopped and reset for him to hire another attorney. This court therefore found a manifest necessity to mistry the case, discharged the jury and reset the matter until April 25, 2011 to give [Petitioner] time to hire another attorney, and [prior counsel] suggested [trial counsel], [who was] another criminal defense attorney who worked in [prior counsel's] office building, and [prior counsel] asked him to take the case. [Petitioner] then hired [trial counsel] . . . and his second trial began on April 30, 2012, a year later, again with the same defense of alibi. [Petitioner] was convicted as charged of attempting to commit Second Degree Murder of the intended victim, but only of reckless endangerment of the other [five] victims, including the [fifteen]-year-old who was permanently paralyzed as a result of the shooting.

[Petitioner] testified at the hearing on this petition that [trial counsel] never met with him to talk about strategy, only asking him to come in to make a payment, and never "went over anything." However, this court finds that regardless of the number of times that they met, [Petitioner] was thoroughly familiar with the facts of his case, the trial strategy and his alibi witness testimony, because he had already begun the trial before with [prior counsel]. [Petitioner] testified that "I met with [prior counsel] and he told me how everything was looking and this is the way we [were] going to go and stuff like that." [Trial counsel] testified that he did not recall specifically how many times he met with [Petitioner] (it had been over five

years since the trial at the time of his testimony), but he stated that his practice was to meet as needed.

. . . .

This court finds this testimony of [ ] trial [counsel] credible, and that of [Petitioner] that he did not know what was going on prior to his trial not credible. Further, [Petitioner] has not mentioned any discovery that was developed or any new evidence that came to light during the time between the two trials that would have made any difference in the outcome of his trial for which his trial attorney should have kept him informed. This allegation fails for lack of any credible proof that [trial counsel's] performance was deficient or that there was any prejudice to [Petitioner] in failing to meet more often.

The post-conviction court found that trial counsel thoroughly cross-examined the State's witnesses and put on several defense witnesses, "doing his best to put forth for [Petitioner] the best defense he could." The post-conviction court denied relief, concluding that "[Petitioner] received a fair trial and was extremely fortunate to have received the verdicts that he did, particularly the reckless endangerment verdict as to the young boy who is now permanently paralyzed from the chest down as a result of the shooting." This timely appeal follows.

## Analysis

On appeal, Petitioner contends that he received ineffective assistance of counsel based on trial counsel's failure to discuss with Petitioner trial strategy and the proof to be presented by the defense at trial. The State responds that the post-conviction court properly denied Petitioner relief on his claim of ineffective assistance of counsel. We agree with the State.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given

their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

- 24 -

In this case, the post-conviction court properly denied relief. At the post-conviction hearing, trial counsel testified that it was his practice to meet with clients as needed but with increased frequency as a trial date approached. Trial counsel stated that he had no reason to believe that he failed to do so with Petitioner. Additionally, trial counsel testified that, due in part to prior counsel's work putting together the trial notebook, he was fully prepared for trial. In denying relief, the post-conviction court accredited trial counsel's testimony and determined that Petitioner's testimony that trial counsel never met with him was not credible. The post-conviction court found that trial counsel was prepared for trial and that the defense strategy employed by trial counsel had been, to an extent, successful. Thus, Petitioner has not shown deficient performance on the part of trial counsel. Moreover, Petitioner has failed to allege, much less prove, how he was prejudiced by counsel's alleged deficiency. Petitioner is not entitled to relief under *Strickland*.

## **Conclusion**

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE